## EXHIBIT A

## AFFIDAVIT

I, David X. O'Neill, being duly sworn, depose and state:

1. I am a Special Agent in the Boston office of the United States Drug Enforcement Agency (DEA) and have been so employed for the past eight years. Since January 2003, I have been assigned to the Logan Airport Drug Task Force and my duties have included the identification and investigation of drug traffickers using various types of transportation -- including airplanes, trains, buses -- to transport drugs. Before my assignment to the Logan Airport Drug Task Force, I was assigned to Mobile Enforcement Team (MET). In that capacity, my duties included assignments to various towns in the Massachusetts area, to identify and investigate local violent drug trafficking organizations.

2. As part of my official duties, I have received training in the investigation of illegal narcotics trafficking, including training in the methods and procedures commonly employed by narcotics traffickers to transport drugs and/or drug proceeds, in the methods commonly used by drug traffickers to avoid detection, and in the methods and procedures used by law enforcement to detect, monitor and investigate drug traffickers and distributors. I have also received additional special training in asset forfeiture of assets related to illegal drug trafficking. I have also attended a number of additional courses and seminars on narcotics investigation techniques. During the course of my

employment with DEA, I have been involved in hundreds of investigations involving drug trafficking, many of which later resulted in the arrest and conviction of drug traffickers and/or the seizure of controlled substances and the seizure and forfeiture of proceeds of illegal drug trafficking.

3. As a result of my personal participation in this investigation, my conversations with other agents and officers, and my review and analysis of reports and other documents, I am familiar with all aspects of this investigation. This affidavit is based both on my personal knowledge and on information that I have received from a variety of other sources, including other law enforcement officers and agents.

4. This affidavit does not contain every fact that I know about this investigation, but is limited to that information necessary to demonstrate probable cause for forfeiture *in rem* against the following property:

a) $8,000 in United States currency seized from Chad Miller on November 8, 2003; and

b) $7,000 in United States currency seized from Gary Sanders on November 8, 2003 (collectively, "the Defendant Currency").

5. As described in more detail below, the Defendant Currency is subject to forfeiture pursuant to 21 U.S.C. §881(a)(6) because it represents moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person

in exchange for a controlled substance or listed chemical in violation of the federal drug laws and/or proceeds traceable to such an exchange, and/or moneys, negotiable instruments, or securities used or intended to be used to facilitate such a violation.

6. On November 8, 2003, along with three other members of the Logan Airport Drug Task Force, I conducted a routine surveillance of Amtrak Train #82, en route from Providence, RI to Boston, MA. At approximately 5:45 pm, during the trip between Providence and Boston, Task Force Agent Jeff Lugas noticed a white male, later identified as Chad Miller, speaking briefly with a second passenger, a black male, later identified as Gary Sanders. Miller and Sanders were not seated together and appeared to have no other communication during the train ride.

7. As the train approached Boston, Miller retrieved a bag and walked to the front of the train car, while looking from side to side and up and down the aisle of the train. Shortly thereafter, Sanders left his seat, retrieved a bag, and walked to the back of the train car.

8. When the train arrived at South Station in Boston, Miller exited the front of the train car and walked down the train platform, repeatedly looking back and appearing nervous. Sanders exited the rear of the train car and proceeded down the train platform, walking approximately 20-30 steps behind Miller. The two

men did not greet or acknowledge each other for approximately 100 yards, until they had almost reached the train station's Atlantic Avenue exit. At that point, the two men began walking together. When approached by law enforcement agents, both Miller and Sanders agreed to answer questions.

9. Miller proceeded to make a number of inconsistent statements. Miller said that he was returning to Boston from Atlanta. First, Miller said he had stayed with friends. Miller later stated that he had stayed at a Hyatt Hotel. However, when asked, Miller could not recall his room number at the Hyatt Hotel, and changed his story, stating that he had stayed at a Hampton Inn and producing a hotel key that apparently came from the Hampton Inn. Miller first stated that he had paid for his hotel room in cash, but then stated that he had used a credit card to reserve the room. Miller also stated that he knew Sanders and that Sanders was the friend that Miller had visited in Atlanta.

10. When asked what he did for work, Miller stated that he ran his own entertainment company, Dog Tag Productions, but was unable to state what his yearly income was, how much money he had made from his last show, or the name of the theater where his last show was held.

11. Other aspects of Miller's statements were contradicted by Amtrak records. When asked, Miller stated that while he was in Georgia he had changed his Amtrak reservation to extend the length

of his stay. In fact, Amtrak records revealed that Miller had actually changed the date of his departure from Boston prior to making the trip to Atlanta. Miller claimed that he had paid for his travel to Atlanta with a credit card and for his return trip in cash. In fact, Amtrak records showed that Miller had paid cash for the entire trip.

12. In response to a question, Miller said that he was not carrying any weapons or drugs, and that he was carrying "a few dollars" in cash. Miller then stated that he was carrying about one thousand dollars. Miller agreed to a search of his person and luggage and was found to be carrying a knife, a clear plastic bag containing approximately a half ounce of green leafy matter, that, based on my training and experience, I believe to be marijuana and $8,000 in cash, consisting of 80 $100 bills. The $8,000 was separated from the rest of Miller's money and was arranged in eight folded packets of $1,000 each. Based on my training and experience, this method of separating money is frequently used by drug traffickers and is commonly known as "dealer folds." In other cases that I have investigated involving known drug traffickers, I have seen them use this method of folding money.

13. When asked why he was carrying so much money, Miller stated (in contradiction to his earlier statements about using credit cards) that he always used cash. Miller also claimed that

he had needed the cash to "party" and pay for strippers in Atlanta. Miller claimed that he had not obtained the money from a bank, but that, before his trip to Atlanta, he had taken $12,000 from a safe.

14. When asked if there was any reason why a drug dog would alert to the money, Miller noted that he believed that a drug dog would alert to any cash, and further specified that he had smoked a lot of marijuana in his hotel room and that the smoke may have settled onto his bag.

15. While two of the officers were talking with Miller, the other two officers talked with Sanders, who had also agreed to be interviewed. Sanders also agreed to a search of his bag and his person. Initially, Sanders said that he was returning to his home on Nantucket from Georgia, where he had spent the summer with an aunt and uncle in Vidalia, GA. However, Sanders later stated that he had stayed in Lawrenceville, GA (a town located approximately 200 miles from Vidalia), and was found to be carrying mail addressed to himself at an address in Lawrenceville, GA. Sanders then said that he had stayed for part of the time in Lawrenceville, GA with his girlfriend. However, he refused to state whether the address on the letters was that of his girlfriend or to explain why he had had mail sent to himself at that address.

16. Sanders stated that Miller was a high school friend of his, but that Miller had not stayed with Sanders in Georgia, but had stayed in Atlanta, and he, Sanders, had stayed in

Lawrenceville.

17. When asked, Sanders stated that he was carrying $7,000 in cash. Like the cash carried by Miller, the money in Sanders' possession consisted of $100 bills. These 70 $100 bills were folded into separate packets of "dealer folds" (as described above), with each packet containing $1,000. Sanders was unable to explain why he had folded the money in this manner. Sanders' bag was found to contain a small glass container. Based on my training and experience, the smell and appearance of the residue in this container appeared to be marijuana residue.

18. Sanders stated that he had earned the money from doing odd jobs for his aunt and uncle in Vidalia, such as helping at his uncle's mortuary and his aunt's rest home. However, Sanders was unable to specify how much he was paid for this work, stating "a couple hundred here and there." Sanders was also reluctant to provide an address for notification, first providing a post office box, then stating that his mailing address was his mother's address on Nantucket. When one of the agents commented that the address given by Sanders for his mother sounded unusual, Sanders stated that his mailing address was the post office box that he had provided. When asked where he slept, Sanders responded that he had no fixed address.

19. At approximately 7:00 pm, Massachusetts Bay Transportation Authority (MBTA) Police Officer James Murray arrived

7

with his trained narcotics-detection dog, Brit. Brit first was shown Miller and Sanders' bags (which did not contain the currency) and did not alert to either bag. The officers then took three clean boxes and placed the $8,000 seized from Miller in one of them. Brit alerted by scratching and biting to the box containing the $8,000. The officers then took three new clean boxes and put the $7,000 seized from Sanders inside one of them. Brit alerted to the box containing the $7,000 by scratching and biting. Brit even took the money out of the box and placed it at Officer Murray's feet.

20.  There is a pending state warrant for Miller's arrest on narcotics charges, based on his possession of marijuana as described above. Currently, he has defaulted by not appearing in state court.

21.  Based on the information detailed above, I have probable cause to believe that the Defendant Currency is subject to forfeiture pursuant to 21 U.S.C. §881(a)(6) because it represents moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of the federal drug laws and/or proceeds traceable to such an

exchange, and/or moneys, negotiable instruments, or securities used or intended to be used to facilitate such a violation.

Signed under the pains and penalties of perjury this 31 day of July, 2004.

David X. O'Neill
Special Agent, DEA

Subscribed and sworn to before me this ___ day of July, 2004.

Notary Public
My commission expires: 5/15/09
Date:

KAY-BETH WHITTEN
Notary Public
Commonwealth of Massachusetts
My Commission Expires
May 15, 2009

9